UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

```
_____
                                    )
JOSE C. RUIZ, CRUZ EDUARDO RUIZ,    )
AND LUKASZ ZAJKOWSKI, Individually  )
And on Behalf of All Similarly-     )
Situated Employees,                 )
                                    )
                Plaintiffs,         )
                                    )
            v.                      )        CIVIL ACTION
                                    )        No. 21-11722-WGY
NEI GENERAL CONTRACTING, INC.,      )
DELTA DRYWALL AND FRAMING LLC,      )
JOSEF RETTMAN, AND                  )
DAVID ADAM VILLANUEVA,              )
                                    )
                Defendants.         )
_____ )
```

YOUNG, D.J.                                  February 29, 2024


**MEMORANDUM OF DECISION**


## I.  INTRODUCTION

In this class action, project workers Jose C. Ruiz

("J.R."), Cruz Eduardo Ruiz ("C.R.") and Lukasz Zajkowski

("Zajkowski") (collectively, and together with other workers,

the "Project Workers") sue NEI General Contracting, Inc.

("NEI"), Delta Drywall and Framing LLC ("Delta"), Josef Rettman

("Rettman"), and David Villanueva ("Villanueva") (collectively,

the "Contractors") alleging underpaid overtime, unpaid wages,

and retaliatory termination.  Compl. ¶¶ 1-4, ECF No. 1.  The

Project Workers now move to certify three overlapping classes based on their three claims against the Contractors.

The Contractors oppose all three subclasses.  They argue first that the issue of who was the employer of the Project Workers is too fact intensive to be dealt with in a class action.  The Contractors then argue that all three subclasses fail to meet the commonality requirement because there were changes in who managed the Project Workers and which Project Workers were present when these claims arose.  Finally, the Contractors argue that Zajkowski is not an adequate representative of the class both because, as foreman, his interests were contradictory, and because he actually got paid his overtime.

The Court **CERTIFIES** the Overtime Wages Class and the Unpaid Wages Class but **DENIES** certification of the Retaliation Class. The Court holds that the employment issue does not preclude class certification and that, with the classes confined to a narrower time-period, the issue of who employed the Project Workers is susceptible to class-wide proof.  Moreover, the Court finds that Zajkowski is an adequate representative based on the effort he has put into the case and his similar facts and injuries to the other members.

The Court narrows both the Overtime Wages and Unpaid Wages Classes in order to avoid fail-safe classes and commonality

issues.  The Retaliation Class, refined or not, fails to meet the requirements of Federal Rules of Civil Procedure ("Rules") 23(a) and 23(b).

**A. Procedural History**

The Project Workers filed this complaint individually and on behalf of all those similarly-situated employees on October 21, 2021, against the Contractors, for allegedly late and unpaid wages, failure to pay time and half for overtime, and retaliatory termination.  Id.  Delta filed a counterclaim against Zajkowski, claiming that Zajkowski actually owed Delta money and was working under Ricardo Pinto ("Pinto"), Delta's project manager, and Pinto's company, "Beyond Construction." Delta's Answer & Countercl. 29-31, at ¶¶ 4-23, ECF No. 36. Delta also moved that Pinto be joined as the entity which owed wages to the workers between June 21, 2021, through August 20, 2021 ("Phase II"), see Mot. Joinder Parties Claims Am. Answer Countercls., ECF No. 46, but this motion was denied.  See Order Re Mot. Joinder, ECF No. 50.

On July 26, 2023, the Project Workers filed a motion to certify three overlapping subclasses under Rule 23(a) and (b)(3).  See Mot. Certify Class, ECF No. 64.  NEI filed a motion in opposition to all three subclass certifications.  See Opp'n Mot. Certify Class ("Opp'n"), ECF No. 68.  On September 15,

2023, the Project Workers filed a reply to the Contractors' opposition to the class certification.  <u>See</u> Pls.' Reply Supp. Mot. Certify Class ion ("Pl.'s Reply"), ECF No. 72.

### B. Facts Alleged

<u>Phase I</u>

In or around August of 2020, NEI subcontracted Delta to work on the Mary D. Stone Project (the "Project").  Delta Mem. Supp. Mot. Joinder, Ex. A, Aff. of David Villanueva ("Villanueva Aff.") ¶ 3, ECF No. 47-1.  Between September 2020 and August 2021, over 150 Project Workers did drywall work on the Project under foreman Zajkowski.  Mem. Supp. Mot. Certify Class, Ex. 1, Decl. of Lukasz Zajkowski ("Zajkowski Decl.") ¶¶ 2, 5, ECF No. 65-1.  Pinto was Delta's project manager and the main point of communication between NEI and Delta on the Project.  Villanueva Aff. ¶ 5.  From September 2020 through June 2021 ("Phase I"), Delta was the entity that requested the Project Workers to work and that paid them for their work.  Zajkowski Decl. ¶ 6.

During Phase I, NEI gave instructions to foreman Zajkowski and project manager Pinto regarding where the Project Workers should work, for how long, the number of Project Workers for the task, and instructions on how to comply with safety regulations.[1] <u>Id.</u> ¶ 7; Aff. Hoffman Opp'n Mot. Certify Class, Ex. F, Dep. of

---

[1] Whether NEI had this direct of an involvement is disputed in the record.  <u>See</u> Opp'n 3-4.

Lukasz Zajkowski ("Zajkowski Dep.") 34:11-23, ECF No. 69-7.  On

occasion, NEI employees even gave instructions directly to the

Project Workers.[2]  Mem. Supp. Mot. Certify Class, Ex. 2, Decl. of

Jose C. Ruiz ("J.R. Decl.") ¶ 7, ECF No. 65-2.

     Beginning in April, Delta began having issues paying the

Project Workers.[3]  Villanueva Aff. ¶ 8.  Project Workers noted

that during Phase I, their wages were often late and they were

not given time and a half for overtime as required.[4] J.R. Decl.

¶¶ 10-13; Mem. Supp. Mot. Certify Class, Ex. 3, Decl. of Cruz

Eduardo Ruiz ("C.R. Decl.") ¶¶ 10-13, ECF No. 65-3.  When Delta

received payment from NEI around June of 2021, Delta allegedly

paid all wages currently owed and instructed Pinto to inform NEI

that Delta would no longer work on the Project.  Villanueva Aff.

¶¶ 8-10.

_____

     [2] See supra note 1.
     [3] The reason Delta was having issues paying is contested.
Delta argues it was because NEI was not issuing payments to its
subcontractors.  Villanueva Aff. ¶ 8; Delta Mem. Supp. Mot.
Joinder, Ex. B, Text Messages between Pinto and NEI Project
Manager Joe Cavallaro, ECF No. 47-1.  In contrast, NEI claims
that Delta was having issues paying its Project Workers because
Villanueva was transferring funds meant for the Project into a
personal account.  Aff. Hoffman Opp'n Mot. Certify Class, Ex. F,
Dep. of Joe Cavallaro ("Joe Cavallaro Dep.") 94:1-23, ECF No.
69-8.
     [4] The Contractors have produced twelve paychecks to twelve
different Project Workers between April and July of 2021 that
shows the correct proportion of overtime was paid in the weeks
these checks were given.  Aff. Hoffman Opp'n Mot. Certify Class,
Exs. B, C, D, F, Earnings Statements ("Earnings Statements"),
ECF No. 69.

Phase II

From June 21, 2021, through August 20, 2021 ("Phase II"),
Delta was no longer involved in the Project, but Pinto and NEI
came to an agreement that Pinto would continue to bring the
Project Workers to finish the Project and NEI would continue to
issue bi-weekly payments for the Project Workers.[5]  After Delta
left, NEI continued to issue payments in the name of Delta for
the Project Workers still working on the Project.  Villanueva
Aff. ¶¶ 16-17; Zajkowski Decl. ¶¶ 15-18.

During Phase II, the issues surrounding Project Workers'
wages became only more exacerbated.  Zajkowski Decl. ¶¶ 17, 19,
24.  NEI's first payment directly to Pinto in July was late and
required the Project Workers to sign a lien waiver to receive
the checks; there was also not enough in the payment to cover
overtime premiums.  Id. ¶ 21; J.R. Decl. ¶¶ 11-12; C.R. Decl. ¶¶
11-12; Mem. Supp. Mot. Certify Class, Ex. 1-B, Lien Waivers, ECF
No. 65-1.  NEI's second payment to the Project Workers, on
August 6, 2021, was late and also did not cover Project Workers'

---

[5] Contested among all three parties is whether NEI was aware
in June 2021 that Delta was out of the picture.  Compare
Villanueva Aff. ¶¶ 8-12; and Zajkowski Decl. ¶¶ 14-17; with Joe
Cavallaro Dep. 96:5-22.  By July 30, 2021, at the latest, it is
evident that NEI knew Delta had left the project, see Delta Mem.
Supp Mot. Joinder, Ex. C, Email from Pinto to NEI, ECF No. 47-1,
and was arranging to continue to pay the same Project Workers to
complete the work without Delta.  Zajkowski Dep. 40:10-41:13,
ECF No. 69-7.

overtime premiums.[6]  Zajkowski Decl. ¶ 13; J.R. Decl. ¶¶ 11-12, 16; C.R. Decl. ¶¶ 12, 16.  <u>Contra</u> Earnings Statements.

Thirty-four Project Workers were paid late between June 21, 2021, and July 17, 2021.  Zajkowski Decl. ¶ 26; Mem. Supp. Mot. Certify Class, Ex. 1-A, Weekly Timesheets ("Weekly Timesheets"), ECF No. 65-1.  No wages at all were paid to the sixty Project Workers who worked from July 18, 2021, until August 20, 2021, when all Project Workers were terminated.  Zajkowski Decl. ¶ 26; Weekly Timesheets; J.R. Decl. ¶¶ 17-18; C.R. Decl. ¶¶ 17-18.

Project Workers began complaining about the late wages and lack of overtime premiums to Pinto and Zajkowski, and Pinto represented their complaints to NEI.  Zajkowski Decl. ¶ 30. Several of the Project Workers had an attorney send a demand letter to NEI threatening a lien on the Project if their wages and overtime were not paid.  Mem. Supp. Mot. Certify Class, Ex. 12, Att'y Letter Regarding Unpaid Wages, ECF No. 65-4.  Soon after receiving the complaints, NEI terminated the remaining Project Workers, purportedly due to Delta defaulting on the Project.[7]  Mem. Supp. Mot. Certify Class Ex. 4, NEI Notice of Default & Notice of Termination, ECF No. 65-4; J.R. Decl. ¶ 18; C.R. Decl. ¶ 18.

---

[6] <u>See</u> <u>supra</u> note 4.
[7] NEI denies that the termination was due to the Project Workers' complaints.  NEI Answer Compl. ¶ 100, ECF No. 24.

## II.   ANALYSIS OF CLASS CERTIFICATION

### A.   Pleading Standard

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979).  Therefore, the burden of proof lies on the plaintiffs to demonstrate that the proposed class satisfies the required elements of Rule 23(a) and 23(b).  Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013).  When determining whether to certify a class, "a district court must conduct a rigorous analysis" to ensure that all the requirements of Rule 23(a) and at least one of the elements of Rule 23(b) are met.  Smilow v. Southwestern Bell Mobile Sys., Inc., 323 F.3d 32, 38 (1st Cir. 2003).  While this rigorous analysis may have some overlap with the merits of the underlying claim, the inquiry must only extend to what is necessary to determine whether Rule 23(a) has been satisfied. Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 465-66 (2013).

To certify a class, Rule 23(a) requires the following elements be satisfied: numerosity, commonality, typicality, and adequacy.  Fed. R. Civ. P. 23(a).  Likewise, Rule 23(b)(3) requires that the factual or legal issues common to all members in the class predominate over the factual or legal issues that are unique to individuals in the class, and that "a class action

is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Additionally, the First Circuit has held that there is an implied requirement in Rule 23(a) that the class definition "allow the class members to be ascertainable" using objective criteria."  In re Nexium Antitrust Litigation, 777 F.3d 9, 19 (1st Cir. 2015).  Finally, the adequacy of counsel to represent the class is another requirement which must be met to certify a class.  See Fed. R. Civ. P. 23(a)(4), 23(g); Garcia-Rubiera v. Calderon, 570 F.3d 443, 460–61 (1st Cir. 2009) (holding that counsel is adequate when they "have diligently pursued their [class's] rights").  The Contractors do not dispute that Attorney Chip Muller is adequate counsel.  See Opp'n.

### 1. Ascertainability

For a class to be ascertainable, membership must be based on objective terms that do not rely on the merits of the claim itself, lest it be a "fail-safe class."  See In re Nexium, 777 F.3d at 22.  A class is an impermissible fail-safe when defined based on terms which depend on the outcome of the subsequent litigation, i.e., "a class defined in terms of the legal injury."  Id. at 22.

### 2. Numerosity

The numerosity requirement is satisfied when "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  At the outset, this requires identifying the size of the putative class.  McLaughlin v. Liberty Mut. Ins. Co., 224 F.R.D. 304, 307 (D. Mass. 2004) (Keeton, J.). "[D]istrict courts may draw reasonable inferences from the facts presented to find the requisite numerosity."  McCuin v. Secretary of Health & Human Servs., 817 F.2d 161, 167 (1st Cir. 1987).  Generally, classes over forty in size have been held to be sufficiently numerous.  See DeRosa v. Massachusetts Bay Commuter Rail Co., 694 F. Supp. 2d 87, 98 (D. Mass. 2010) (Wolf, J.).  A class may be smaller than forty, however, if there are other reasons why joinder is impracticable, such as: the judicial economy in avoiding multiple actions, the limited financial resources of class members, the inability for individual class members to litigate, or the fear of retaliation from suing individually.  See, e.g., Anderson v. Weinert Enterprises, Inc., 986 F.3d 773, 777 (7th Cir. 2021); In re Modafinil Antitrust Litig., 837 F.3d 238, 252-53 (3d Cir. 2016); Colo. Cross Disability Coal. v. Abercrombie & Fitch Co., 765 F.3d 1205, 1225 (10th Cir. 2014) (McHugh, J., concurring in part and dissenting in part); In re TWL Corp., 712 F.3d 886, 894 (5th Cir. 2013); Robidoux v. Celani, 987 F.2d 931, 935-36 (2d Cir.

1993); <u>Coleman</u> v. <u>District of Columbia</u>, 306 F.R.D. 68, 81-82 (D.D.C. 2015).

### 3. Commonality

Rule 23(a)(2) requires that the class members have "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Class members, however, need only have a single issue in common.  <u>Natchitoches Parish Hosp. Serv. Dist.</u> v. <u>Tyco Int'l., Ltd.</u>, 247 F.R.D. 253, 264 (D. Mass. 2008) (Saris, J.).  In <u>Wal-Mart Stores, Inc.</u> v. <u>Dukes</u>, the Supreme Court clarified that this commonality means the "claims must depend upon a common contention," which "must be of such a nature that it is capable of class-wide resolution. . . ."  564 U.S. 338, 350 (2011).  Thus, a class must be able to "generate common answers apt to drive the resolution of the litigation."  <u>Id.</u>  (quoting Richard A. Nagareda, <u>Class Certification in the Age of Aggregate Proof</u>, 84 N.Y.U.L. Rev. 97, 132 (2009)).

### 4. Typicality

Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Typical does not mean, however, that the representative's claims or defenses need be identical to all those in the class.  <u>In re Credit Suisse-AOL Secs. Litig.</u>, 253 F.R.D. 17, 23 (D. Mass. 2008) (Gertner, J.) (citing <u>Swack</u> v. <u>Credit Suisse First Boston</u>, 230 F.R.D. 250, 260

(D. Mass. 2005) (Woodlock, J.)).  A representative party's claims are typical of the class if the representative "can fairly and adequately pursue the interests of the absent class members without being sidetracked by her own particular concerns."  Swack, 230 F.R.D. at 264.

### 5. **Adequacy**

Similar to typicality, Rule 23(a)(4) is also directed at the representative parties and requires them to "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  A representative party is not adequate if "there are conflicts of interest between the proposed representative and the class."  William Rubenstein, Alba Conte & Herbert B. Newberg, Introduction to adequacy standard, 1 Newberg and Rubenstein on Class Actions § 3:54 (6th ed.).  Merely lacking identical interest, however, is not enough for a representative party to be found inadequate.  Murray v. Grocery Delivery E-Servs. USA Inc., 55 F.4th 340, 345–46 (1st Cir. 2022) (citing Cohen v. Brown Univ., 16 F.4th 935, 945 (1st Cir. 2021) (quoting Matamoros v. Starbucks Corp., 699 F.3d 129, 138 (1st Cir. 2012))).  The interests of the representative parties must lead to conflicts which "'are fundamental to the suit and . . . go to the heart of the litigation' [in order to] breach the adequacy-of-representation standard."  Id. at 346 (quoting

Cohen, 16 F.4th at 945-46 (quoting Matamoros, 699 F.3d at 138)).

### a. Zajkowski's Adequacy

The Court addresses the Contractors' arguments that Zajkowski is not an adequate representative in this section of its opinion because the issue of his adequacy is identical in each of the subclasses. The Contractors argue that Zajkowski is not adequate because, first, there is evidence he was given overtime premiums. See Aff. Hoffman Opp'n Mot. Certify Class, Ex. B, Zajkowski Earnings Statement, ECF No. 69-2; Ex. E, Zajkowski Statement of Employment, ECF No. 69-5. Second, in his role as foreman, Zajkowski told NEI that a worker who complained about payment issues from another job site Delta was on would be terminated and that no one should complain to NEI in that way. Zajkowski Dep. 125:9-127:24.

This Court, however, holds that Zajkowski is an adequate representative who has earnestly pursued the matter from the beginning. First, Zajkowski disputes the evidence of any overtime paid to him and his claims arise out of the same fact pattern as the other Project Workers. Reply 11-12, 20. Second, Zajkowski's role as foreman does not place his interest at odds with the other Project Workers. Even as foreman, he represented their complaints to Pinto and NEI. Zajkowski Decl. ¶ 22. Zajkowski's alleged dislike of one worker who may have

13

complained to colleagues about some missed payments from another job is irrelevant here.  This worker's complaints were related to Delta and another job site; Zajkowski was not the one to decide to fire him, and the firing had to do with this worker's attitude and work ethic, not his complaints about missed payments.  Zajkowski Dep. 125:9-127:24.

### 6. Predominance and Superiority

To certify a Rule 23(b)(3) class, questions of law or fact common to class members must predominate over questions affecting only individuals.  In re Relafen Antitrust Litig., 218 F.R.D. 337, 343 (D. Mass. 2003).  Thus, the predominance requirement is a more stringent commonality requirement, because not only must there be shared questions, but these questions must be more prevalent than the questions affecting each individual in the class.  Cormier v. Landry's Seafood House-North Carolina, Inc., No. 13-11822-NMG, 2015 WL 12732420, at *4 (D. Mass. Feb. 23, 2015) (Boal, M.J.).  It is important to note that, "[w]here . . . common questions predominate regarding liability, [] courts generally find the predominance requirement to be satisfied even if individual damages issues remain."  Smilow, 323 F.3d at 40 (emphasis added).

For wage related disputes, a class action is generally "superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3), because

it "overcome[s] the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." Gammella v. P.F. Chang's China Bistro, Inc., 482 Mass. 1, 11 (2019) (citing Salvas v. Wal-Mart Stores, Inc., 452 Mass. 337, 369 (2008)).

## B. The Subclasses

The Project Workers propose certifying three overlapping 23(b)(3) subclasses: (1) a Retaliation Class, (2) an Overtime Class, and (3) an Unpaid Wages Class. Mem. Supp. Mot. Certify Class ("Mem. Supp.") 8, ECF No. 65. Under Rule 23(c)(5), a plaintiff or district court may subdivide a class to avoid conflicts of interest and/or to help administratively manage the class action. See In re Hannaford Bros. Customer Data Sec. Breach Litig., 564 F.3d 75, 79 (1st Cir. 2009). As the Second Circuit has explained, creating subclasses can "focus discovery," help "weed out" claims where no representative party is adequate, make trial "more orderly," and make providing notices easier for the defendant. Marisol A. v. Giuliani, 126 F.3d 372, 379 (2d Cir. 1997) (per curiam).

Likewise, here, these three classes should remain divided because each subclass is brought under a different statutory provision, and it may be that not each Project Worker shares the claim each class brings. Thus, this division of the classes

will make it administratively easier for the parties to conduct
discovery and for the Court to analyze the separate claims.

### C.   NEI's Employer Status

As a preliminary matter, NEI argues that the classes cannot
be certified because the question of whether NEI was the
employer of the Project Workers -- instead of Delta or Pinto --
precludes the certification.  Opp'n 7.  NEI argues that this
question -- who is the Project Workers' employer -- is so fact
intensive that it is only suitable for individual suits.  Id.
Even if NEI were found to be an employer during Phase II of the
Project, it argues this would mean that there was no unifying
payment policy nor the same Project Workers between Phase I,
when Delta was the employer, and Phase II, when NEI was the
employer.  Id. at 8-9.  Thus, the class would fail to satisfy
the commonality requirement of Rule 23(a)(2).  Id. at 9.

This Court holds that whether NEI was a joint or direct
employer is a question susceptible to class-wide proof.  First,
this Court has refined the classes to include only contentions
that took place during Phase II of the Project, which renders
commonality issues between Phase I and Phase II moot.
Bellermann v. Fitchburg Gas & Elec. Light Co., 470 Mass. 43, 58-
59 (2014) (holding that where a redefinition would assuage a
judge's concern about certifying the class, the judge should
redefine the original class).  Second, during Phase II, whether

16

NEI was an employer of the Project Workers is a question common to all the Project Workers' injuries and can be resolved with one common answer for all members.  See Wal-Mart Stores, Inc., 564 U.S. at 350-52.

   D.  **Retaliation Class**

      1.  **The Substantive Law**

   The Retaliation Class is brought under the anti-retaliation provision of the Massachusetts Wage Act, which states that "[n]o employee shall be penalized by an employer in any way as a result of any action on the part of an employee to seek his or her rights under the wages and hours provisions of this chapter."  Mass. Gen. Laws ch. 149, § 148A.

   To prove a claim of retaliation under Massachusetts General Laws chapter 149, section 148A, the Project Workers need to show (1) that they were engaged in conduct protected under the Massachusetts Wage Act, (2) that NEI subjected the Project Workers to an adverse employment action when NEI terminated them all, and (3) that NEI terminated the Project Workers because of their protected conduct.  Travers v. Flight Servs. & Sys., Inc., 808 F.3d 525, 531 (1st Cir. 2015); Smith v. Winter Place LLC, 447 Mass. 363, 367-68 (2006) (interpreting Mass. Gen. Laws ch. 149, § 148A).  At the class certification stage, there is no need to prove all the elements in a retaliation claim.  There will necessarily be some evaluation of the underlying claim's

merits here, but only so far as to ensure the requirements of
Rules 23(a) and 23(b) are satisfied.  Amgen Inc., 568 U.S. at
465-66.

### 2. Ascertainability

The Retaliation Class is defined as "[a]ll employees who
worked on the Mary D. Stone Project . . . under foreman Lukasz
Zajkowski at any time [during Phase II]."  Mem. Supp. 8.  This
class definition is indefinite and would include a vast majority
of persons who were not working the week NEI terminated all
Project Workers.  In the last week before NEI terminated the
Project Workers, the timesheets show that only eleven workers
were presently working on the Project, of the seventy-one
workers who worked on the Project at various points during Phase
II.  Weekly Timesheets 31.  Thus, for the class definition to be
adequately ascertainable, it would need to be defined as "all
those Project workers who were working on the Project at the
time of termination."

In In re Nexium, the First Circuit held that when it is not
possible to ascertain the class without creating a fail-safe
class, and class action would be more efficient than individual
suits, it is then negligible if the class has a de minimis
number of uninjured plaintiffs, since they can be easily removed
at the damages stage.  777 F.3d at 22.  In this case, however,

the number of Project Workers who were currently working on the
Project at the time NEI terminated the Project Workers can
easily be ascertained from the timesheets that week, see Weekly
Timesheets 31, and the definition can be narrowed to include
these injured plaintiffs without creating a fail-safe class.
Therefore, the Court adopts the aforementioned narrower
definition.

### 3. Numerosity

Using the more definite class definition, however, the
number of Project Workers –– eleven –– would not satisfy the
numerosity requirement. DeRosa, 694 F. Supp. 2d at 98. With
such a small number of members in the class, a joinder is
practicable and so the litigation would follow "the usual rule
that litigation is conducted by and on behalf of the individual
named parties only" rather than as a class action. Califano,
442 U.S. at 700-01. Since the eleven members of this potential
class overlap with the other two subclasses and have individual
claims for retaliation, it is not impracticable for these
individuals to recover, as the Commonwealth's Supreme Judicial
Court in Gammella wished to ensure. 482 Mass. at 11-12.

### 4. Commonality

The Retaliation Class, if including all those who worked
during Phase II, rather than just the eleven Project Workers

working in the last week before termination, lacks commonality.[8]
It is unclear why different Project Workers left the project,
and whether they left temporarily or permanently before the
termination.  The fluctuating nature of the work force makes it
impracticable to generate a common answer as to the reason for
termination or departure.  Some Project Workers may have left
earlier due to NEI failing to provide wages in the last five
weeks of the Project, others may have found more profitable
work, while still others may have been on the Project but were
sick that week.  These fact-intensive and individual inquires
such mean that Project Workers who were not working on the
Project at the time of termination are not susceptible to a
class action.  <u>Wal-Mart Stores, Inc</u>., 564 U.S. at 350
("Dissimilarities within the proposed class are what have the

---

[8] The Contractors' argument that the Retaliation Class lacks
commonality is focused on the incorrect issue.  The Contractors
argue that not every Project Worker made a complaint and,
therefore, not every Project Worker's termination could be
resolved by answering whether the termination was due to a
complaint.  Opp'n 11.  The facts as alleged in this case,
however, suggest that NEI's payment practices during Phase II
affected everyone: some Project Workers communicated to Pinto
and Zajkowski the crew-wide complaint about wages, and Pinto and
Zajkowski communicated the complaint about wages on behalf of
the whole crew to NEI.  Mem. Supp. Mot. Certify Class, Ex. 4,
Texts Between Pinto and Cavallaro, ECF No. 65-4; Ex. 5, Texts
Between Pinto and Tenreiro, ECF No. 65-5; Zajkowski Decl. ¶ 30;
J.R. Decl. ¶¶ 13-15; C.R. Decl. ¶¶ 13-15.  In this context, each
Project Worker during Phase II vicariously complained to NEI
about their wages through Pinto and Zajkowski, thereby making
the protected conduct common to all Project Workers.

potential to impede the generation of common answers." (quoting Nagareda, _supra_, at 132)).

### 5. **Typicality & Adequacy**

The three named plaintiffs, Zajkowski, J.R., and C.R., were working on the Project in the final week and had complained about the wage problems, but their injuries and legal claims are not typical of the other sixty Project Workers who had worked on the Project during Phase II.  _See_ Zajkowski Decl. ¶ 30; Weekly Timesheets; J.R. Decl. ¶¶ 13-15; C.R. Decl. ¶¶ 13-15.  Likewise, these representative parties are not adequate representatives since most of the members of the purported class were not terminated but seemingly left earlier for various reasons.  This difference is "fundamental to the suit and . . . [would] go to the heart of the litigation" in a retaliation class.  _Cohen_, 16 F.4th at 946 (quoting _Matamoros_, 699 F.3d at 138).

### 6. **Predominate & Superior**

A class which has failed to meet the Rule 23(a)(2) commonality requirement logically will fail to meet the more stringent Rule 23(b)(3) predominance and superiority requirement.  _Cormier_, 2015 WL 12732420 at *4.  Here, it is apparent that the individual issues of all seventy-one workers during Phase II overwhelm the retaliation issue that only eleven Project Workers seemingly faced.  Furthermore, since the class

21

is either too small or with too many factual and legal differences, a class action would not be "superior to other methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### 7. Conclusion with Respect to the Retaliation Class

The Court, therefore, **DENIES** certification of the Retaliation Class.  The Court holds that the Retaliation Class, when defined appropriately, lacks numerosity, and when given the current indefinite definition lacks the other class requirements.  Even so, it is apparent that at least some of the Project Workers have grounds to bring a claim of retaliation. Some Project Workers engaged in a protected action when they complained to Pinto and Zajkowski, since "[a] complaint made to an employer (or a manager of the employer) by an employee who reasonably believes that the wages he or she has been paid violate [section 148] readily qualifies as such an 'action.'" Smith, 447 Mass. at 367.  Furthermore, the impact from being terminated after not being paid for the last five weeks of the Project is clearly an adverse employment impact.  Mogilevsky v. Wellbridge Club Mgmt., Inc., 905 F. Supp. 2d 405, 412 (D. Mass. 2012) (Stearns, J.) (holding that "termination is the gold standard of an adverse employment action").  The Project Workers do not, however, qualify to bring this action as a class.

22

### E.  Overtime Class

#### 1.  The Substantive Law

The Overtime Class is brought under the Minimum Fair Wages Act, which states that any employee in the Commonwealth must be paid at least one and one-half times their regular rate for any hours worked in excess of forty hours in a week.[9]  Mass. Gen. Laws ch. 151, § 1A.

#### 2.  Ascertainability

The Overtime Class is defined as "[a]ll employees who worked in excess of 40 hours in one or more weeks ('Overtime Hours') on the Mary D. Stone Project . . . under foreman Lukasz Zajkowski between October 2020 and August 20, 2021 but were not paid time and a half their hourly rate for their Overtime Hours."  Mem. Supp. 8.  As defined, the Overtime Class is a fail-safe class, and the time-period spanning Phase I and Phase II obviates commonality.

The Court therefore modifies the Overtime Class definition by striking the impermissible fail-safe clause ("but were not paid time and a half their hourly rate for their Overtime Hours") from the definition so that class membership is based on objective terms that do not rely on the merits of the claim.  See In re Nexium, 777 F.3d at 19; William Rubenstein, Alba Conte

---

[9] Project Workers do not fall into any of the exceptions listed in Mass. Gen. Laws ch. 151, § 2.

& Herbert B. Newberg, Common problems associated with the definiteness requirement—Definitions based on the merits of individual class members' claims, 1 Newberg and Rubenstein on Class Actions § 3:6 (6th ed.).

The time-period for the Overtime Class is narrowed only to Phase II to assuage this Court's concern about certifying the class given the factual differences between Phase I and Phase II. Moreover, the evidence the Project Workers provide about overtime premiums not being paid appears to revolve around incidents during Phase II. See, e.g., J.R. Decl. ¶ 16; C.R. Decl. ¶ 16.

This Court modifies the definition, rather than outright denying the class certification, because a denial at this stage would be a "drastic remedy" that would preemptively dispose of the case altogether before relevant discovery could take place. Costa v. Dvinci Energy, Inc., 342 F.R.D. 38, 40 (D. Mass. 2022) (Gorton, J.); Bellermann, 470 Mass. at 58-59.

The concern that the class definitions, as modified to remove the fail-safe clause, would be overly broad and could encapsulate uninjured Project Workers is an issue the First Circuit has addressed. In In re Nexium, the First Circuit concluded that it is appropriate to include a de minimis number of uninjured plaintiffs in the class if: these plaintiffs can then easily be removed at a later stage of the litigation, it is

more efficient than individual inquiry, and narrowing the definition more would tend towards a fail-safe class. 777 F.3d at 21-22. Here, it would be easier and more efficient to deduce after discovery which members of the Overtime Class were owed more, and which were not. Moreover, any further narrowing of the class definition would result in a fail-safe class.

### 3. Numerosity

The timesheets from Phase II indicate that there were thirty-five Project Workers who worked more than forty hours in a week. See Weekly Timesheets. While this number is slightly under forty, the Court holds that a class action is still the superior method of adjudication and joinder is impracticable since here, class members have limited financial resources to litigate individually and the wage dispute will provide such small relief with an individual suit that it is impracticable to pursue it outside of a class. DeRosa, 694 F. Supp. 2d at 97 (quoting McLaughlin, 224 F.R.D. at 307 ("While this requirement 'is often referred to as "numerosity," . . . it might more properly be called the "impracticability" requirement, because the inquiry called for by Rule 23(a)(1) often involves more than merely counting noses.'")); Gammella, 482 Mass. at 11-12.

### 4. Commonality

All the Project Workers in the Overtime Class have allegedly suffered the same injury and their claims are based on the same contention: that the Contractors had a unifying policy or practice that violated the Minimum Fair Wages Act by not paying the Project Workers time and a half for Overtime Hours. Mem. Supp. 8-9.

As this Court has already narrowed the class definition to Project Workers only working during Phase II, the Contractors' arguments related to commonality between Phase I and Phase II are moot.  The Contractors also argue that the Project Workers have no evidence of a unifying policy or practice of not paying overtime premiums.  Opp'n 15-16.  Also, the Contractors have produced evidence showing that a few of the members of the class were given some overtime premiums for different weeks.[10]  See Earnings Statements.

While class certification will often involve "considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," Wal-Mart Stores, Inc., 564 U.S. at 351 (internal quotation marks omitted), these considerations must only extend to what is necessary to determine whether Rule 23(a) has been satisfied. Amgen Inc., 568 U.S. at 465-66.  This case differs from Wal-Mart

---

[10] The Project Workers argue that these earning statements are inaccurate or fabricated.  Pls.' Reply 11-12.

Stores, Inc.: there, the plaintiffs brought suit for discrimination regarding millions of different employment decisions.  564 U.S. at 352.  In contrast, here there are a discreet number of plaintiffs who worked during Phase II under one employer who dispersed their wages according to an internal policy.  Thus, the Court need not now decide the merits of the claim now based on twelve disputed earning statements but need only determine if all members share a common injury and contention which this class inquiry will answer and resolve. Here, there is sufficient proof that the Project Workers share a common injury and contention which this class inquiry will answer and resolve.

### 5.  Typicality

All three of the named plaintiffs worked overtime through Phase II and each claim to have the same injury -- not getting overtime premiums.  Zajkowski Decl. ¶¶ 12-13; Weekly Timesheets; J.R Decl. ¶¶ 11-12;  C.R. Decl. ¶¶ 11-12.  The representative parties, therefore, can "fairly and adequately pursue the interests of the absent class members without being sidetracked by [their] own particular concerns."  Swack, 230 F.R.D. at 264.

### 6.  Predominance and Superiority

Issues of unpaid overtime premiums predominate over the individuals' issues -- seeking different amounts of damages. The differences in damages can be calculated easily based on

timesheets and paychecks and so will not overwhelm the common question of whether there was a unifying policy or practice that violated the Minimum Fair Wages Act.  Smilow, 323 F.3d at 40; In re Nexium, 777 F.3d at 21.  A class action here is superior to other methods of adjudication since each Project Worker's individual damages would not be great enough to pursue relief absent a class and because the number of Project Workers in the class makes it administratively easier to try them all together. Gammella, 482 Mass. at 12-13.

### 7. Conclusion with Respect to the Overtime Wages Class

Accordingly, the Court **CERTIFIES** the subclass for overtime with the following refinements to the class definition: "all employees who worked in excess of 40 hours in one or more weeks ("Overtime Hours") on the Mary D. Stone Project . . . under foreman Lukasz Zajkowski between June 21, 2021, through August 20, 2021 (Phase II)."

### F. Unpaid Wages Class

#### 1. The Substantive Law

The Unpaid Wages Class is brought under the Massachusetts Wage Act, which states that Contractors "shall pay weekly or bi-weekly each such employee the wages earned by him to within six days of the termination of the pay period during which the wages were earned. . . . "  Mass. Gen. Laws ch. 149, § 148.

### 2. Ascertainability

The Unpaid Wages Class is defined as "[a]ll employees who worked on the Mary D. Stone Project . . . under foreman Lukasz Zajkowski between October 2020 and August 20, 2021, but were not timely paid their hourly wages for all hours they worked on the Project." Mem. Supp. 8. For the same reasons detailed with regard to the Overtime Class, see supra Section II.E.2, the Court refines the Unpaid Wages Class definition by striking the fail-safe clause in its last line and narrowing the time period to June 21, 2021, through August 20, 2021 (Phase II), since all the Project Workers' contentions seemingly arise during Phase II. Mem. Supp. 9-12. Based on the timesheets, it will be easy to ascertain which class members worked during the late payment period of June 21, 2021, through July 17, 2021, and the missed payment period of July 18, 2021, through August 20, 2021. Id. at 12.

### 3. Numerosity

With seventy Project Workers sharing the same injury and contention around unpaid wages, see Weekly Timesheets, it is impracticable to do a joinder instead of a class action. Cf. DeRosa, 694 F. Supp. 2d at 97-98 (holding that a joinder would be impracticable in a putative class of one hundred ten members). Thirty-four Project Workers were working during the period that wages were allegedly late. See Weekly Timesheets.

29

Sixty Project Workers were working during the period when wages were completely missed.  See id.  These two heavily overlapping groups belong in the same subclass because the Massachusetts Wage Act not only "protects wage earners from the long-term detention of wages by unscrupulous employers . . . but also imposes strict liability on employers, who must suffer the consequences of violating the statute regardless of intent." Reuter v. City of Methuen, 489 Mass. 465, 468-69 (2022) (internal quotation marks and citations omitted).

### 4. Commonality

All the Project Workers in the Unpaid Wages Class have allegedly suffered the same injury of missed payments and their claims are based on the same contention: that the Contractors had a unifying policy or practice that violated the Massachusetts Wage Act by not paying the Project Workers on time or at all.

Although the damages will be higher for those Project Workers who never received their wages as opposed to those who received them late, both suffered the same injury of delayed compensation, just to differing degrees.  While Wal-Mart Stores, Inc. makes it clear that while there needs to be the same injury and same answer, there is no requirement that all class members need share the same degree of injury.  See 564 U.S. at 349-52. As noted in Montoya v. CRST Expedited, Inc., even if a violation

will require some individualized calculations, the class members
are not "any less 'similarly situated' with respect to their
challenge to [Defendant's] pay practices." 311 F. Supp. 3d 411,
421 (D. Mass. 2018) (Saris, C.J.). Both late and missed
payments raise the same common legal question under the
Massachusetts Wage Act, which can be resolved with one common
answer regarding the Contractors' practice or policy around
payments. Thus, there is sufficient commonality between the
class members to satisfy Rule 23(a)(2).

### 5. Typicality

All three of the representative parties worked during the
late payment period and the missed payment period, and each
claim to have suffered the same injury of late and missed
payments. Zajkowski Decl. ¶ 19; Weekly Timesheets; J.R. Decl.
¶¶ 13-17; C.R. Decl. ¶¶ 13-17. Their interests are therefore
typical of those in the class and make them adequate
representatives. See Swack, 230 F.R.D. at 264.

### 6. Predominance and Superiority

The common question surrounding unpaid wages predominates
over the individuals' issues -- seeking differing amounts of
damages. The differences in damages will be easily calculable
based on timesheets and paychecks and so will not overwhelm the
common question of whether there was a unifying policy or

practice that violated the Massachusetts Wage Act.  _Smilow_, 323
F.3d at 40; _In re_ _Nexium_, 777 F.3d at 21.  A class action is
superior to other methods of adjudication because each Project
Worker's individual damages would not be great enough to pursue
relief absent a class, and because the number of Project Workers
in the class makes it administratively easier to try them all
together.  _Gammella_, 482 Mass. at 12-13.

### 7. **Conclusion with Respect to the Unpaid Wages Class**

Accordingly, the Court **CERTIFIES** the subclass for Unpaid
Wages with the following refinements to the class definition:
"all employees who worked on the Mary D. Stone Project . . .
under foreman Lukasz Zajkowski between June 21, 2021, through
August 20, 2021 (Phase II)."

## III.  CONCLUSION

Therefore, in consideration of the refined class
definitions, the Court **GRANTS** the Motion to Certify Class, ECF
No. 64, as to the following two subclasses: the Overtime Wages
Class and the Unpaid Wages Class, since they satisfy the
requirements of Rule 23(a) and 23(b).  The Court **DENIES** the
Motion to Certify Class, ECF No. 64, as to the Retaliation Class
subclass because it lacks either numerosity or commonality,
depending on how the class is defined, and so the claims under

that subclass are better suited for individual adjudication and joinder.

**SO ORDERED.**


<u>/s/ William G. Young</u>
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[11]

---

[11] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 46 years.